SOUTHERN KANSAS RAILWAY COMPANY OF TEXAS V.
W. C. ISAACS & BRO.

Decided February 25, 1899.

**1. Damages—Measure of—Injury to Cattle by Railway Company.**

Damages recoverable by a lessee of a pasture from a railway company for its failure to construct a cattle guard under Revised Statutes, article 4527, making a railroad company liable to the party injured by such neglect for all damages resulting therefrom, can not exceed the cost of employing someone to guard the gap, where the lessee could have stopped the gap, as allowed by article 4526, or at least prevented the damages by having the gap guarded, and some such means would have been adopted by an ordinarily prudent person.

**2. Judicial Notice.**

The appellate court does not take judicial cognizance of what is meant by "chousing cattle."

Appeal from Hemphill. Tried below before Hon. B. M. Baker.

*J. W. Terry* and *H. E. Hoover,* for appellant.

*Theodore Mack,* for appellees.

STEPHENS, Associate Justice.—The appellees in January, 1897, leased a large pasture in Hemphill County, known as the Mendota pasture, it being then contemplated that the owners of the pasture would inclose it with a fence, which they did about the 1st of May following, so as to embrace the track of appellant's railway, and the fence so made needed only a cattle guard where the railroad entered the pasture on the west to make a complete inclosure. The appellees brought this suit to recover damages from the appellant railway company resulting from its failure to construct this cattle guard.

About the middle of May, 1897, and before the cattle guard was constructed, they put about 1249 steers in the pasture, and kept them there until the last of July following. Some time in the intervening June they inquired of the local agent of the railway company as to whose duty it was to construct the cattle guard, and at his suggestion wrote to a nonresident agent of the company about the matter, but received no reply. It was not until the latter part of September following that the cattle guard was constructed.

Of the damages claimed the jury allowed the following items:

"Expenses gone to by plaintiffs for hiring men to watch the
   gap mentioned in petition ............................ $65 00
"Damages on 1231 head of cattle belonging to plaintiffs by
   reason of the driving and chousing of them, at $1 per head. 1231 00
"Damages for the death from southern fever or splenetic fever
   of eighteen head of plaintiffs' cattle, at $27.50 per head.... 495 00
"Damages on twenty head of plaintiffs' cattle from contract-
   ing the southern or splenetic fever, and which plaintiffs al-
   lege did not die, at $5 per head ........................ 100 00
                                                            ————
   "Total .......................................$1891 00"

All but the first two items, however, were remitted by the appellees in the trial court.

That the statute (article 4523 and 4524) upon which the action was founded applies to a large pasture in the Panhandle as well as to a small field in Eastern Texas, we entertain no sort of doubt. "Field" and "inclosure" are used interchangeably throughout this statute. Indeed, one of the definitions of field is, "a wide extent of land suitable for tillage or pasture."

The controlling question then is; what was the measure of appellees' recovery? It is quite clear that they were not entitled to the items remitted, and it seems unreasonable to sustain the remaining items, par-

ticularly the larger one of $1231, damages to 1231 cattle "by reason of the driving and chousing of them," which was done by the employes of appellees themselves, all because the railway company neglected to construct one cattle guard in a pasture of 23,000 acres to prevent the escape of the cattle, though one of the appellees admitted in his testimony that one man "could have kept the cattle from going out of this gap or others coming in," that he "never hired a man for that purpose," and that "he could have hired a man to stay there for that purpose for $20 per month."

The cattle were in the pasture less than two months and a half, so that the cost of minding the gap need not to have exceeded $50. The cost of putting in the cattle guard itself could not have been great. It may be that the appellees were not required to do either, as they contend, article 4527, Revised Statutes, providing that the railway company neglecting to construct the proper cattle guards and stops "shall be liable to the party injured by such neglect for all damages that may result from such neglect." But evidently the Legislature did not mean by the use of this language to make a railway company liable for damages other than those resulting proximately from the neglect to construct the cattle guard, nor to make it liable to the party injured for the damages done by himself to his own property, unless there should arise a necessity, real or apparent, to injure his own property in order to prevent a greater loss.

It may be that the owner of the land would not be required to take any steps to avoid the natural consequences of the neglect of the railway company to perform the statutory duty of constructing cattle guards, as contended by appellees, though we need not and do not so hold in this case; yet if he does undertake to do so, he should unquestionably act with reasonable prudence and in the exercise of common sense, and not inflict unnecessary injury upon his own property. In this case the appellees did undertake to avoid the consequences of their cattle escaping from the pasture, and were allowed to recover a large sum of money for injuries which they themselves continued from day to day to inflict for a period of nearly two months and a half in the effort, when obviously by incurring the small expense required to have the gap guarded, or to have a stop put in, as they were authorized to do by article 4526 of the statute, they could have prevented the escape of the cattle and avoided the injuries inflicted upon them. It would not do to allow them to prevent the escape of their cattle by any means they might adopt, for that would be to allow them to kill them outright, if they should see fit to do so, and recover the full value thereof as the measure of damages. They were certainly required, if they undertook to act at all, to act as a person of ordinary prudence would have done under the same circumstances.

Exactly what injury was done the cattle by "driving and chousing" them is not made entirely clear by the record, since the word "chousing" was used on the trial in a sense evidently as yet unknown to the lexicographers, though apparently quite well understood by all parties en-

gaged. This word seems to be Turkish origin, and stands as a memorial in our language of a gigantic cheat perpetrated in 1609 by a messenger or interpreter of the Turkish embassy upon Turkish merchants resident in England, and "chouse" is hence defined by Mr. Webster in his dictionary thus: "To cheat, trick, defraud;—followed by *of* or *out of*; as to chouse one out of his money." It may be that, using the term in a highly metaphorical sense, the cattle, by being frequently driven to and fro in the pasture to prevent their escape, were thus choused or cheated out of their grass. The provincial use, except inferentially, is not explained by the record.

But however this may be, the appellees in undertaking to avoid the consequences of the railway company's neglect to construct a cattle guard, were not at liberty to choose an extraordinary and unreasonable means, and then tax the railway company with a large sum of money to cover the resultant damage, instead of that which was both natural and comparatively inexpensive, and without hurt or damage. At all events, it was for the jury to say whether they acted with reasonable prudence in the effort to take care of their cattle and prevent their escape from the pasture, and it was error to refuse appellant's first special charge embodying this principle, as follows: "If you find from the evidence in this case that the plaintiff could have prevented the damages by employing some one to guard the gap, and they knew the damages could have been avoided by that means, and that an ordinarily prudent person would have done so, then you are charged that plaintiffs can not recover in this case a greater amount of damages than it would have cost them to have prevented the damages by employing some one to guard the gap."

Appellees produced evidence tending to show that the men in their service bestowed a certain portion of their time and labor upon watching the gap and preventing the escape of the cattle, which, if the cattle guard had been constructed, would have been given to other employment, and if the proof had shown what this was worth they might have been entitled to recover therefor; but as the record now stands, there is no basis in the proof for the recovery of the remaining item of $65. The effect of the verdict is to allow them the expense of minding a gap which they did not mind, and also heavy damages because they did not have it minded.

For these reasons, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*